**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**

| | | |
|---|---|---|
| **PAYMENT ALLIANCE** | ) | **Electronically Filed** |
| **INTERNATIONAL, INC.** | ) | |
| **2101 High Wickham Place** | ) | |
| **Louisville, Kentucky 40245** | ) | |
| | ) | **CASE NO.** 3:21-CV-489-CHB |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **VERIFIED COMPLAINT FOR** |
| | ) | **INJUNCTIVE AND OTHER RELIEF** |
| | ) | |
| **NATHAN HARBISON** | ) | |
| **316 East 10th Street** | ) | |
| **New Albany, Indiana 47150** | ) | |
| | ) | |
| **Defendant.** | ) | |

Plaintiff, Payment Alliance International, Inc. ("PAI" or "Plaintiff"), by counsel and for its

Verified Complaint for Injunctive and Other Relief against Defendant, Nathan Harbison

("Harbison" or "Defendant"), states as follows:

**NATURE OF ACTION AND RELIEF REQUESTED**

1.      This is a matter involving the misappropriation of confidential and trade secret

information, breach of restrictive covenants, and breach of fiduciary duty. Harbison is using PAI's

confidential information to assist a competitor with soliciting and acquiring PAI's customers. PAI

discovered Harbison's improper conduct because third parties inadvertently used Harbison's old

PAI email address to send Harbison information at various points in recent days, which revealed

Harbison's improper conduct.

2.      Plaintiff PAI has a nationwide network of approximately 100,000 ATM terminals

and provides ATMs and ATM processing services to its customers. Defendant Harbison is the

former Financial Operations Manager of PAI. PAI seeks to recover from Harbison for his

improper misappropriation of PAI's confidential information and trade secrets, and other violations of the signed Non-Solicitation and Non-Disclosure Agreement (the "Agreement"), signed Verification of Receipt of the PAI Privacy Policy and Information Security Policies Handbook (the "Verification"), and signed Employee Handbook Acknowledgement (the "Handbook Acknowledgment"). Exs. A-1 – A-4. PAI also seeks injunctive relief against Harbison for that same conduct and in relation to Harbison's plans to continue violating the Agreement and Handbook.

3.    As a condition of his employment, Harbison signed both the Agreement and Handbook with PAI which prohibit the improper retention, use, and disclosure of PAI's confidential information and trade secrets; the solicitation of independent sales organizations or any current or potential customers; and the provision of any products or services competitive with PAI's services from or for any independent sales organizations, current customers, or potential customers. Harbison also signed the Verification wherein he agreed to not use PAI's confidential information "for [his] own purposes" and "to take all reasonable precautions to assure that PAI Confidential Information and/or information that has been entrusted to PAI by third parties such as customers, will not be disclosed to unauthorized persons." Ex. A-2.

4.    Harbison and his attorney claim that Harbison's new employer is National ATM Brokerage, LLC ("NAB") and that Harbison is not violating the Agreement. To the contrary, PAI has discovered information indicating that Harbison is actually working in conjunction with one of PAI's competitors and is targeting the customers that Harbison knows are PAI's customers that own larger groups of ATMs. Harbison merely filed the paperwork to create NAB in recent weeks, possibly to make it appear that he is an independent broker and not working for a competitor.

5.    A few days before resigning from PAI, Harbison emailed himself a report to his personal email address containing detailed financial and other information relating to almost 2,000

ATMs. Harbison's attorney has offered to return this, and potentially other PAI confidential information, in Harbison's possession and claimed that Harbison was not using PAI's information and not violating the other restrictions in the Agreement.

6.      However, Harbison is violating the Agreement and the return of the information will not, by itself, sufficiently stop Harbison's improper conduct. At the same time that Harbison is apparently telling his attorney that he is not violating the Agreement, Harbison is trying to move to a competitor one of the top-10 largest ATM owners[1] in the list of PAI customers detailed in the report that Harbison sent to his personal email. Harbison flew to Atlanta on July 20, 2021 and, based on information and belief, likely met with the owner, who is located in Atlanta, about moving over and/or selling his business to PAI's competitor.

7.      PAI seeks (i) to enjoin Harbison from further disclosure or use of PAI's trade secrets and confidential information and breach of his non-solicitation obligations, (ii) the return of all documents and electronic files containing PAI's trade secrets and confidential information, and (iii) the recovery of actual and exemplary damages.

## PARTIES

8.      Payment Alliance International, Inc. is a Delaware corporation with its principal place of business in Louisville, Kentucky.

9.      Nathan Harbison is an individual that was formerly employed by PAI in Louisville, Kentucky and resides at 316 East 10th Street, New Albany, IN 47150, and may be served at that address or wherever he may be found.

---

[1] PAI will provide the Court in camera information regarding the identity of the customer that is being targeted by Harbison and a competitor but does not want to disclose that information in a public filing.

## JURISDICTION AND VENUE

10.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), as there is diversity of citizenship between the parties because PAI is a citizen of Delaware and Kentucky and Harbison is a citizen of Indiana.  The amount in controversy exceeds $75,000, exclusive of interest and costs.[2]

11.     Venue is proper in the Western District of Kentucky, Louisville Division, because (i) the injury occurred (and/or will continue to occur if an injunction is not entered) in this judicial district, where PAI is located, and (ii) because the parties agreed that "[a]ny action brought to enforce the terms or to remedy violation of [the Non-Solicitation and Non-Disclosure Agreement signed by the parties] shall be brought in a court of competent jurisdiction in Jefferson County of the Commonwealth of Kentucky."  Ex. A-1.[3]

## FACTUAL BACKGROUND AND DEFENDANT'S WRONGFUL CONDUCT

### A.  Payment Alliance International, Inc. Is A Provider Of ATMs And ATM Services That Manages Vast Stores Of Confidential Data In The Ordinary Course Of Its Business.

12.     PAI is an ATM provider with approximately 100,000 ATMs.  PAI is an Independent Sales Organization ("ISO") which works with payment processors ("Processors") that connect merchants, merchant banks and card networks to enable PAI to deploy and manage privately owned ATMs across the country.  Often, PAI is the owner of the ATMs and contracts with individuals or businesses to place the ATMs on their premises.

13.     In addition to owning and operating its own ATMs, PAI often acts as an aggregator of services for customers who own and operate smaller ISOs, known as Independent Sales

---

[2] The attorney's fees alone in a lawsuit of this nature will easily exceed $75,000 to take the case through trial.
[3] Exhibits A (and its attachments A-1 through A-10), B, C and D are attached hereto and incorporated herein.

Representatives ("ISRs") who own anywhere from one to a few thousand ATM terminals and/or contract with other ATM owners to provide the network access and other services that are ultimately provided by PAI. These ISRs enter into agreements with PAI wherein PAI uses its reputation, buying power, and existing relationships with Processors to obtain more favorable rates for transaction processing than the ISRs could obtain on their own. PAI then facilitates ATM transactions for the ISRs by passing account information from the ISRs and their ATMs to the Processors, and back from the Processors to the ISRs.

14.     An integral part of PAI's business is maintaining confidential information such as contact and financial information for current and potential ISR customers, as well and the details of its agreements with specific ISRs. Specifically, PAI compiles and tracks revenue data, certain contract terms that differ between ISRs, including the amount each ISR receives from the charges associated with a consumer using an ATM ("Surcharges"), and the location and volume of transactions for each ATM owned and/or operated by a given ISR. PAI has expended significant resources over many years to compile, protect, and analyze this information.

15.     In order to expand its ATM business, PAI uses this information to analyze the potential risks and benefits of acquiring ISRs and to periodically acquire ISR customers that present the correct opportunity. To that end, PAI employs mergers & acquisitions analysts who regularly analyze the financial information and transaction volumes of ISRs.

**B.  <u>Nathan Harbison Is A Former PAI Employee Who Had Access To PAI's Confidential Information.</u>**

16.     Harbison joined PAI's Business Development group as a mergers & acquisitions analyst. Harbison's duties necessitated access to a number of PAI's databases, including those that contained information about the transaction volume, owner contact information, ATM

locations, and various other information related to the terms of PAI's contracts with ISR customers.

17.     Because of the confidential access that analysts need, each new hire is required to sign a number of intake documents, including the Agreement, the Handbook Acknowledgment, the Verification, the and a Surrender of Confidential Records and Property (collectively referred to as the "New Hire Paperwork"). Exs. A-1 – A-4.  When Harbison joined PAI on August 22, 2016, he signed the New Hire Paperwork which prohibits him from making any unauthorized use or disclosure of confidential information to which Harbison had access by virtue of his employment with PAI. This prohibition restricted the unauthorized use and disclosure of PAI's confidential information, including, but not limited to, PAI's trade secrets and other confidential information as well as confidential information from or regarding third parties, such as customers, potential customers, market partners, suppliers, and financial institutions.

18.     The Agreement also mandates that Harbison not directly or indirectly engage in the solicitation of "products or services competitive with the services offered by PAI… from or for any current or potential customer [or] independent sales organization… with which the Company has solicited and/or is providing such Products and/or Services during the period of Employee's employment with the Company."  Ex. A-1.

19.     Harbison's access to contact and financial information relating PAI's customers allowed Harbison to analyze ISRs, in part to determine the viability of acquiring them. Prior to Harbison's resignation from his position, effective June 18, 2021, he was promoted to Director of Business Development, which allowed for additional contact with current and potential ISR customers.  During Harbison's PAI employment, he obtained the customer contact information from PAI's internal customer records and learned the revenue and other information associated with the ATMs associated with these customers.

C. **At All Times During Harbison's Employment With PAI, PAI Took Reasonable Efforts To Protect Its Confidential And Trade Secret Information.**

20.    PAI has taken great efforts to protect its confidential and trade secret information. All employees that have access to PAI's confidential and trade secret information are required to sign non-disclosure agreements such as the Agreement that Harbison signed before being allowed to have access to such information.

21.    All employees, including Harbison, who have access to PAI's confidential and trade secret information are also required to sign a verification of PAI's Privacy and Information Security Policies Handbook Acknowledgement, such as the Verification signed by Harbison, which specifically states:

> I, *Nathan Harbison*, the Employee/User, agree to take all reasonable precautions to assure that PAI Confidential Information and/or information that has been entrusted to PAI by third parties such as customers, will not be disclosed to unauthorized persons. At the end of my employment or contract with PAI, I agree to return to PAI all information to which I have had access as a result of my position with the Company. I understand that I am not authorized to use this information for my own purposes, nor am I at liberty to provide this information to third parties without the express written consent of PAI.

Ex. A-2.

22.    PAI's employees, including Harbison, are likewise required to sign an Employee Handbook Acknowledgement, which includes a copy of PAI's Confidentiality Policy.  Ex. A-3. In addition to the provisions of the handbook, the acknowledgment that Harbison signed provides:

> I understand that, as a result of my employment, I may have access to confidential information, including (but not limited to) salary information about employees, financial information about Payment Alliance International, and customer information.
>
> I understand and agree that as a condition to my continued employment, I am required to keep all of the above information confidential and not disclose any such information to any person unless authorized to do so by the head of my department.  I understand that unauthorized discussion or disclosure of any

confidential information may result in immediate termination of my employment.

By my signature below, I hereby agree that I have read this Confidentiality Policy and agree to above by its requirements and that I have received this Employee Handbook and agree to familiarize myself with its contents.

*Id.*

23.    PAI's employees, including Harbison, are also required to sign a Surrender of Confidential Records and Property Agreement. Ex. A-4. This agreement requires the return of all computers, cell phones and other items that may contain PAI's confidential information at the end of employment. This agreement also requires the return of all information relating to PAI's products and practices and all of PAI's property, which would include information about its customers. Ex. A-1, ¶ 5; Ex. A-3.

24.    In addition to the password protection referenced *supra*, PAI also has its employee laptops configured so that information on PAI's network is not stored locally on the laptop when it is accessed through the laptop and has installed special software on their system to mitigate spam and harmful emails that could impact confidential information. This protects the information from being compromised if an employee's laptop is stolen.

**D.    Harbison Misappropriated PAI's Confidential And Trade Secret Information.**

25.    On June 14, 2021, PAI changed Harbison's laptop password and e-mail password as a normal part of his exit from the company. Shortly thereafter Harbison's e-mail access was restored in order to allow him temporary access to his files so that he could complete a final revenue report ( the "Report") before his last day on June 18, 2021.

26.    On June 15, 2021 at 2:22 p.m., Harbison, now aware that his access would soon be revoked, sent a copy of the Report to his personal e-mail account. Ex. A-5. The Report included a wish list of PAI's confidential information and trade secrets including the location information

for over 1,900 ATMs.[4] *Id.*  The Report also contained the cash loading revenue, surcharge amounts, first and last transactions, and number of transactions for each terminal.

   **E.  Harbison Has Breached And Will Continue To Breach The Agreement By Soliciting PAI's Customers, By Providing Analysis Of PAI's ISR Customers To A Competitor, And By Moving PAI's Customers to the Competitor While Using PAI's Confidential And Trade Secret Information.**

   27.    The information contained in the Report is the same information that Harbison would have used as a mergers & acquisitions analyst to determine the best ISRs for PAI to attempt to acquire based on the amount of revenue associated with each potential acquisition and the details about their ATMs, including the number of ATMs per customer, number of monthly transactions, surcharge income for each transaction, etc.  PAI also uses this information when determining contract terms to offer to existing customers.  Similarly, any third-party Harbison shares it with or acts on behalf of will be able to utilize this information to underbid PAI in the acquisition of ISRs or when attempting to move over PAI's customers by offering more favorable contract terms.

   28.    One such third party, USATM Group, LLC ("USATM"), is a competitor of PAI. At the same time, PAI provides processing to certain USATM terminals and customers.  Like PAI, USATM is also in the business of owning and operating ATMs and regularly acquires smaller ISOs.  PAI and USATM have even sought to acquire the same ISO in recent history.  PAI prevailed in that acquisition, and USATM has apparently decided that the best way for it to prevail going forward is to use Harbison to go after PAI's customers using the contacts and confidential information that Harbison has from his time at PAI.

   29.    On July 2, 2021, two weeks after Harbison's last day, two e-mails were inadvertently sent to Harbison's PAI e-mail address from Brendan O'Kelly at USATM. Exs. A-6

---

[4] The Report that was attached to the email is not attached as an exhibit in order to protect the confidential information therein.  Plaintiff will make the Report available to the Court for an in camera inspection.

and A-7.  These e-mails discussed the creation of a website for a new company called National ATM which would presumably broker the sales of ISOs using PAI's confidential information and trade secrets.  *Id.*  As stated in the email, USATM encouraged Harbison to get a webpage in place because USATM's expectation was that Harbison was "going to start contacting people" that USATM wants to take over.  *Id.*  The information that USATM prepared for Harbison to put on a webpage is meant to create the impression with PAI customers being contacted by Harbison that he has a "network of motivated buyers across the country" (Ex. A-6) when, in reality, Harbison is simply going to convince PAI's customers to sell to USATM in order for USATM to provide the processing services for those ATMs going forward.[5]

30.    Following the discovery of the July 2 e-mails, PAI's counsel sent a cease and desist letter to Harbison notifying him of his violations of the Agreement.  Ex. B.  In response, Harbison confirmed his receipt of the letter and requested a copy of the Agreement.  Ex. C.  Harbison also had an attorney send a letter to PAI's counsel claiming that Harbison's new employer was NAB and that Harbison was not in violation of the restrictive covenants in the Agreement because NAB "does not provide any of the services" (such as ATM processing) referenced in the restrictive covenants in the Agreement.  Ex. D.  However, Harbison apparently did not share with his attorney that NAB is an entity that was only set up by Harbison a few weeks ago (Ex. A-8) and that the entity Harbison is actually working on behalf of is USATM, which does provide processing and other services referenced in the restrictive covenant.

31.    In the same letter, Harbison's attorney admitted that Harbison "has in his possession certain reports generated while employed at PAI" and offered to return them.  Ex. C.  While PAI

---

[5] PAI is very familiar with USATM because, as stated *supra*, USATM contracts with PAI for PAI to provide processing services to some of the terminals that USATM controls.  USATM also uses other entities for processing of other ATM terminals.

will obviously seek the return of the Report and other information taken, Harbison's attorney makes it clear that Harbison does not believe his conduct is a violation of the Agreement and will apparently move forward with his course of conduct unless stopped by the Court. As part of his justification, Harbison's attorney incorrectly claims that certain confidential information about PAI's customers is not protected because the specific information is not specifically enumerated in the Agreement or because the contact information and location of those contacted by Harbison can be located elsewhere. To the contrary, PAI's confidential information (such as a compilation of financial and contact information about its customers) is protected under the law regardless of whether the Agreement existed at all. Harbison would not know the financial or contact[6] information relating to PAI's customers had he not obtained that information from the compilations of that information in PAI's system. Also, simply because the contact information for an ATM owner is available piecemeal somewhere in the world does not make PAI's compilation of that information any less protected.[7] There are hundreds of thousands of ATMs in the United States, and Harbison will not know who is an ideal ATM business to contact and acquire if he did not use the confidential information that he was provided access to at PAI.

32.    In fact, rather than soliciting randomly the owner of one of those hundreds of thousands of ATMs in the US, Harbison is instead soliciting one of the top-10 revenue producers on the misappropriated Report that Harbison emailed to himself shortly before leaving so that he can convince the customer to sell to USATM. On July 19, 2021, Harbison's PAI e-mail received yet another e-mail (the "Customer Email") meant for Harbison. The Customer Email was from the individual (the "Solicited Customer") that owns the group of ATMs that is one of the top-10

---

[6] Based on information and belief, Harbison recorded the contact information of PAI's customers into his personal cell phone from PAI's internal list of customer contact information.
[7] While it is not necessary to specifically state it in an agreement, the requirement to keep customer information confidential is enumerated in another agreement signed by Harbison. Ex. A-3.

revenue producers on the Report misappropriated by Harbison. Ex. A-9.  The Solicited Customer is another TSR that PAI provides processing services to and is a source of significant revenue. The Customer E-mail contained a spreadsheet which detailed and analyzed a portion of the information from Harbison's Report.  In fact, the body of the Customer Email states that the spreadsheet was incomplete, but that "[the owner] only took financials from PAI only in this report. [The owner] will have to add financials from other processors later on which is not much (about 7-8%)." Ex. A-9.

33.     On July 19, despite his receipt and confirmation of the cease and desist letter, Harbison apparently booked a flight and received a check-in notification that was sent to Harbison's old PAI email address for a July 20 flight from Louisville, Kentucky to Atlanta, Georgia, the headquarters of the Solicited Customer.  Ex. A-10.

34.     In addition to breaching the confidentiality provisions of the Agreement, Harbison's solicitation of PAI's customer on behalf of USATM, a competitor that owns a large volume of ATMs and provides processing services, is a violation of the Agreement.   The Agreement specifically prohibits Harbison from "directly or indirectly" engaging in the solicitation of, among other things, "ATM processing services" and "any products or services competitive with [PAI's] services" "from or for any current or potential customer, independent sales organization, sponsoring agent, or correspondent financial institution with which the Company has solicited and/or is providing such Products and/or Services...."  *See* A-1.  Harbison's conduct is also a breach of the non-solicitation provision because USATM is also a customer of PAI[8] in addition to being a competitor, and Harbison is specifically prohibited from soliciting competitive services or products "for any current or potential customer."  Put simply, Harbison is prohibited

---

[8] As stated *supra*, USATM contracts with PAI for the provision of some of USATM's ATM processing.

from doing any solicitation on behalf of USATM. In addition, the Solicited Customer certainly falls into the category of being a "current or potential customer" and/or "independent sales organization" that PAI was doing being with while Harbison was employed. Harbison even called on the Solicited Customer personally while at PAI. Harbison is not allowed to solicit the Solicited Customer.

**F.** **The Misappropriation Of PAI's Confidential And Trade Secret Information And Solicitation Of PAI's Potential And Existing Customers Will Result In Irreparable Harm.**

35. The confidential and trade secret information misappropriated by Harbison is integral to PAI's business, its successful operation, and continued growth.

36. The contact information for the owners of and/or decision makers at PAI's customers has been compiled for many years and is for internal use only. Also, the information contained in the spreadsheets sent by Harbison to himself was compiled over many years and consisted of, among other things, the locations of almost 2,000 of PAI's customers' ATMs, rate information relating to the surcharges for those ATMs, and information relating to the revenue associated with the ISR owners of those ATMs. Because the information is not generally known, this information gives PAI a competitive advantage in the marketplace over others that do not have the information. If someone (such as Harbison) uses this information on behalf of a competitor (such as USATM), a competitor will be able to target PAI's customers, including the most profitable ISR customers, and attempt to lure those customers away with more favorable agreement terms or purchase the customer outright.

37. During his employment, Harbison utilized confidential and trade secret information (such as customer contacts, rates, revenue, and location information) of PAI to analyze potential acquisitions and then later to develop relationships with PAI's current and potential ISR customers.

Harbison will use PAI's confidential and trade secret information to unfairly compete against PAI on behalf of a competitor because Harbison knows, and has, PAI's confidential contact information, pricing and strategies for PAI's existing and potential customers.

38.    If Harbison is able to continue to violate the Agreement and directly or indirectly participate in the targeting and/or acquisition of PAI's customers or potential customers which PAI has solicited and/or to whom PAI was providing products or services during Harbison's employment, PAI will suffer irreparable harm for which damages will be difficult to quantify.  PAI depends on the relationships with its customers to maintain a profitable business.  The loss of the highest revenue customers would be devastating to PAI and its financial stability.  Even smaller losses of customers can have a significant long-term negative impact.  Many of PAI's customers eventually own multiple ATMs and refer additional customers.  Therefore, the loss of even a small number of customers will likely translate into the loss of a significant number of customers and revenue that is difficult to quantify.  Additionally, the revenue generated from an ATM can vary significantly, which will also make damages difficult to quantify.

39.    All conditions precedent to PAI's claims against Harbison have occurred, been performed, satisfied, or otherwise fulfilled.  PAI has performed all of its obligations to Harbison under the various agreements and policies described herein.

### COUNT I – MISAPPROPRIATION OF TRADE SECRETS AND CONFIDENTIAL INFORMATION/VIOLATION OF THE KENTUCKY UNIFORM TRADE SECRETS ACT

40.    Plaintiff incorporates all preceding paragraphs in this Complaint as if fully set forth below.

41.    This cause of action is brought by PAI against Harbison under the Kentucky Uniform Trade Secrets Act ("KUTSA").  KY. REV. STAT. ANN. §§ 365.880-.900.

42.     PAI has invested substantial time, effort, money, and resources over many years in developing its trade secrets and confidential information.  Only PAI and those to whom PAI discloses confidential information in confidence know PAI's trade secrets and confidential information.  These trade secrets and confidential information are not matters of public knowledge or generally known within the industry.  PAI has taken reasonable measures to protect the confidentiality of the information.

43.     The trade secrets and confidential information that belong to PAI enabled PAI to obtain a fair and lawful competitive advantage over those who do not know or have the right to use PAI's trade secrets or confidential information.

44.     Harbison improperly disclosed to a third party confidential and trade secret information belonging to PAI.

45.     Harbison has used or disclosed, or has threatened to use or disclose, PAI's trade secrets and confidential information for his own financial gain or the gain of third parties.  This disclosure of PAI's valuable trade secrets and confidential information is a misappropriation of PAI's trade secrets and confidential information under the KUTSA.  KY.REV.STAT. ANN. §§ 365.880-.900.

46.     Harbison is well aware that this information is to remain confidential.  Because Harbison understands the importance of PAI's trade secrets and confidential information, and Harbison has disclosed, or has threatened to use or disclose, PAI's trade secrets and confidential information to benefit himself or a third party, his misappropriation of PAI's trade secrets and confidential information is willful and intentional.  Harbison's tortious conduct was aggravated by the kind of willfulness, wantonness, and malice for which the law allows the imposition of punitive damages.  KY.REV.STAT. ANN. § 365.884(2).  Therefore, Plaintiff is entitled to all actual and exemplary damages resulting from this misappropriation and breach of the KUTSA.

47.     As demonstrated by his continued action after receipt and response to PAI's cease and desist letter, Harbison's actions were taken with gross indifference to the rights of PAI and with conscious intent to harm PAI.  To punish such actions and deter others from similar wrongdoing, Harbison should be assessed punitive damages in an amount to be determined by the trier of fact.

48.     PAI has already had to incur thousands of dollars in attorney's fees and to devote employee time to attempt to remedy the risk caused by Harbison's misconduct.

49.     Under the KUTSA, PAI is entitled to recover its reasonable and necessary attorney's fees in its prosecution of this case. KY.REV.STAT. ANN. §§ 365.886.  Plaintiff retained counsel.  Harbison's misappropriation of PAI's confidential and trade secret information was willful and malicious because Harbison intentionally misappropriated PAI's confidential and trade secret information by consciously disregarding the rights of Plaintiff.

50.     Harbison's wrongful use and/or disclosure of PAI's trade secrets and confidential information has seriously damaged PAI, and will continue to seriously damage PAI, in an amount that is not presently ascertainable but is in excess of this Court's minimum jurisdictional limits.  In addition, Harbison has been unjustly enriched by PAI's confidential and trade secret information.

51.     "Actual or threatened misappropriation may be enjoined." KY.REV.STAT. ANN. § 365.882.  Because Harbison will likely continue his acts of misappropriation or threatened misappropriation of PAI's trade secrets and confidential information and targeting of PAI's current or potential customers, which will irreparably injure PAI, PAI requests that this Court enjoin Harbison's improper activities.

### COUNT II – BREACH OF CONTRACT

52.     Plaintiff incorporates all preceding paragraphs in this Complaint as if fully set forth below.

53.     Harbison and PAI are parties to the Agreement, Handbook Acknowledgment, and Verification, which are contracts.

54.     Harbison breached the contract by using PAI's confidential and trade secret information (including customer contact and financial information) for his own benefit and the benefit of a third party and by sharing with third parties PAI's information revealing what customers to target.  Harbison also breached the contract by soliciting customers of PAI behalf of a competitor (that is also a PAI customer, which is also separately prohibited) that provides processing and other services offered by PAI.  Harbison also breached the other agreements referenced herein through his misappropriation.

55.     Harbison's breaches have proximately caused PAI to suffer damages.  In the alternative, PAI should be awarded at least nominal damages.  PAI has been damaged by having to incur attorney's fees and costs to remedy the risk to its information caused by Harbison breaches. PAI also has been damaged by having to devote employee time and undertake investigations and Information Technology examinations to mitigate the risks posed by Harbison's breaches.

56.     Harbison agreed in the Agreement that PAI is entitled to an injunction to stop the improper conduct if the Agreement was breached.  Therefore, because Harbison has breached and will likely continue his acts of misappropriation or threatened misappropriation of PAI's trade secrets and confidential information and targeting of PAI's current or potential customers, which will irreparably injure PAI, PAI requests that this Court enjoin Harbison's improper activities.

### COUNT III – BREACH OF FIDUCIARY DUTY

57.     Plaintiff incorporates all preceding paragraphs in this Complaint as if fully set forth below.

58.     While employed by PAI, Harbison owed PAI a fiduciary duty of trust and undivided loyalty.

59.     Harbison's fiduciary duty required him to, among other things, act in PAI's best interests and maintain the confidentiality of PAI's trade secrets and other confidential and proprietary business and customer information.  Harbison's fiduciary duties also required him to refrain from, among other things, taking PAI's confidential information, using PAI's confidential information for his own benefit, and soliciting PAI's customers and potential customers.

60.     Harbison breached his fiduciary duties to PAI by engaging in the conduct alleged above **before** resigning his employment with PAI, and continues to breach his fiduciary duties by using PAI's confidential and trade secret information) and by soliciting and/or threatening to solicit PAI's existing and potential customers.

61.     As a direct and proximate result of Harbison's breach of fiduciary duty, PAI has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated.  Accordingly, PAI is entitled to a temporary restraining order, preliminary injunction and permanent injunction.

### COUNT IV –UNFAIR COMPETITION

62.     Plaintiff incorporates all preceding paragraphs in this Complaint as if fully set forth below.

63.     Harbison's conduct as set forth above and incorporated herein is unlawful, unfair, fraudulent and deceptive, and constitutes unfair competition.

64.     As a direct and proximate result of Harbison's unfair competition, PAI has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated.  Accordingly, PAI is entitled to a temporary restraining order, preliminary injunction and permanent injunction.

## PRAYER

WHEREFORE, Plaintiff Payment Alliance International, Inc. respectfully requests that a judgment be entered in its favor and against Nathan Harbison as follows:

a.    In support of all claims for relief, a Temporary Restraining Order, Preliminary Injunction and Permanent Injunction immediately enjoining and restraining Harbison, directly or indirectly, and whether alone or in concert with his current employer or others, from:

    i.    using, disclosing, transferring or transmitting (for any purpose) any confidential or trade secret information belonging to PAI;

    ii.    using PAI's confidential customer information (such as contact information, financial data, etc.) to target PAI's customers on behalf of a competitor to convince them to move their processing to or sell their business to the competitor;

    iii.    violating the terms of the Non-Solicitation and Non-Disclosure Agreement dated August 22, 2016 and signed by the parties, including, but not limited to, that Harbison, for a period of three (3) years from his termination of employment with PAI, shall not directly or indirectly engage in the solicitation of products or services competitive with the products and services offered by PAI from or for any current or potential customer, independent sales organization, sponsoring agent, or correspondent financial institution with which PAI has solicited and/or is providing such products and/or services during the period of Employee's employment with PAI; and

    iv.    destroying, deleting, erasing, modifying, or otherwise failing to preserve intact any documents, records, or files (written or electronically stored) or any other evidence regarding or related to Plaintiff's claims and allegations in this petition, including, but not limited to, any evidence stored on any personal computer, cell phone, USB device, personal or other email system/network.

b.    Issue an order requiring that Harbison return to PAI all confidential and trade secret information belonging to PAI within twenty-four (24) hours;

c.    That Harbison, and anyone acting in concert or participation with him, be ordered, within forty-eight (48) hours, to return to PAI the originals, copies and any and all electronically stored confidential and trade secret information of PAI, provided that any such information purged from an electronic source shall be printed prior to purging and all copies provided to PAI;

d.    Award Plaintiff actual damages and, in the alternative, nominal damages;

e.    Award Plaintiff damages in the amount Harbison was unjustly enriched;

f.      Award Plaintiff its attorney's fees;

g.      Assess punitive damages against Defendant; and

h.      Award Plaintiff all further and other relief at law and in equity to which Plaintiff is entitled.

Respectfully Submitted,

*/s/ Janet P. Jakubowicz*
Janet P. Jakubowicz
Benjamin J. Lewis
DENTONS BINGHAM GREENEBAUM LLP
3500 PNC Tower
101 South Fifth Street
Louisville, Kentucky 40202
Phone: (502) 589-4200
Facsimile: (502) 587-3695
janet.jakubowicz@dentons.com
ben.lewis@dentons.com

*Pro hac vice to be filed*:
Randy J. Bruchmiller
GREATHOUSE HOLLOWAY MCFADDEN
TRACHTENBERG PLLC
4200 Montrose, Suite 300
Houston, Texas 77006
Phone:  (512) 368-8183
Facsimile:  (832) 442-5430
Randy@GreatLaw.com

COUNSEL FOR PLAINTIFF
PAYMENT ALLIANCE INTERNATIONAL, INC.

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 28, 2021, a true and correct copy of the foregoing was served by electronic mail to the following (and will be served by other means as soon as possible):

Zachary C. Glaser          Nathan Harbison
Offit Kurman               316 East 10th Street
1801 Market Place, Suite 2300    New Albany, IN  47150
Philadelphia, PA 19103


/s/ Janet P. Jakubowicz
COUNSEL FOR PLAINTIFF
PAYMENT ALLIANCE INTERNATIONAL, INC.


21643276.1

## VERIFICATION

I am the Senior Vice President – Market Partner of Payment Alliance International, Inc.  I have read the foregoing Verified Complaint for Injunctive and Other Relief and know the contents thereof; the same is true to my knowledge, except as to matters therein stated to be alleged upon information and belief, and as to those matters I believe them to be true.

_____

Brian Haynes, Senior Vice President – Market Partner
Payment Alliance International, Inc.