UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:21-CV-00489-GNS-CHL

PAYMENT ALLIANCE INTERNATIONAL, INC.                                   PLAINTIFF

v.

NATHAN HARBISON                                                        DEFENDANT

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Plaintiff's Motion for Preliminary Injunction (DN 5). The motion is ripe for adjudication. For the reasons stated below, the motion is **GRANTED IN PART** and **DENIED IN PART**.

### I.     STATEMENT OF FACTS AND CLAIMS

Plaintiff Alliance International, Inc. ("PAI") owns a national network to ATM terminals and provides ATMs and ATM processing services to its customers. (Compl. ¶ 2, DN 1). Defendant Nathan Harbison ("Harbison") formerly served in numerous positions at PAI including Director of Business Development. (Hayes Decl. 3-4, DN 1-2). As a condition of his employment, Harbison signed a non-solicitation and non-disclosure agreement ("Agreement"). (Haynes Decl. Ex. A-1, DN 1-2). In addition to the Agreement, Harbison also signed: (i) a verification form ("Verification") acknowledging that he had received PAI's handbook, which contained policies regarding privacy and information security; and (ii) an acknowledgment ("Acknowledgment") regarding the receipt of the employee handbook. (Haynes Decl. Ex. A-2, DN 1-2; Hayes Decl. Ex. A-3, DN 1-2).

When Harbison left his employment, his access to PAI's computer systems was revoked. (Compl. ¶ 25). His access, however, was temporarily reinstated while he assisted PAI with the

completion of a final revenue report. (Compl. ¶ 26). PAI subsequently learned that Harbison downloaded trade secrets and confidential information of PAI around the time of his resignation. (Compl. ¶¶ 26-31).

Plaintiff then filed this action asserting claims for a violation of the Kentucky Uniform Trade Secrets Act ("KUTSA"), breach of contract, breach of fiduciary duty, and unfair competition. (Compl. ¶¶ 40-64). After Plaintiff moved for a temporary restraining order and preliminary injunction, the Court granted a temporary restraining order and permitted the parties to conduct limited discovery. (TRO, DN 8; Am. TRO, DN 12). Following a hearing on Plaintiff's request for a preliminary injunction, the motion is ripe for a decision.

## II.    JURISDICTION

The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332 as there is complete diversity between the parties and the amount in controversy exceeds the sum of $75,000.00.

## III.    STANDARD OF REVIEW

In determining whether to grant a preliminary injunction, a court considers the following factors: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of the injunction." *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007) (quoting *Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 760 (6th Cir. 2005)). A court should make specific findings concerning each factor, "unless fewer are dispositive of the issue." *In re DeLorean Motor Co.*, 755 F.2d 1223, 1228 (6th Cir. 1985) (citing *United States v. Sch. Dist. of Ferndale*, 577 F.2d 1339, 1352 (6th Cir. 1978)). The

movant bears the burden of making a "clear showing" of the need for the grant of a preliminary injunction. *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997); *see also Gonzales v. O Centro Espírita Beneficente Uniã do Vegetal*, 546 U.S. 418, 429 (2006) ("[T]he burdens at the preliminary injunction stage track the burdens at trial.").

### IV. DISCUSSION

#### A. Likelihood of Success

The first factor is the likelihood that Plaintiff will prevail on the merits of its claims. *See Tenke Corp.*, 511 F.3d at 542 (citation omitted). In relevant part, the Agreement provides:

> 2. Non-Solicitation. During the period commencing on the first date of Employee's employment with the Company and ending on the third (3rd) anniversary following termination of Employee's employment with the Company, the Employee shall not, except as an employee of the Company, directly or indirectly engage in the solicitation of ATM equipment sales, leasing or placement; ATM processing services; credit card or debit card processing services, or the provision of any products or services competitive with Company services (hereinafter jointly referred to as "Products and/or Services"), from or for any current or potential customer, independent sales organization, sponsoring agent, or correspondent financial institution with which the Company has solicited and/or is providing such Products and/or Services during the period of the Employee's employment with the Company.
> 3. Non-Disclosure. During the period commencing on the date of Employee's employment with the Company and ending on the third (3rd) anniversary following the termination of the Employee's employment, the Employee shall not directly or indirectly divulge, furnish, or make accessible to anyone or use in any way other than in the ordinary course of business of the Company any Confidential Information of the Company; any Confidential Information of any Company vendor; service provider bank or merchant client; co-venturers; and/or any other third parties doing business with Company (hereafter "Third Parties"), regardless of the form of the Information, whether written or verbal, tangible or intangible, electronic or visual whether such Confidential Information was developed by the Company, the Employee a Third Party or by others. "Confidential Information" shall include but not be limited to all "non-public personal information" of Company's merchant customers as that phrase is defined by Title V of the Gramm-Leach-Bliley Act (15 U.S.C. § 6801 *et seq.*). Confidential Information shall also include but not be limited to any Company data or Information that is proprietary and/or not generally known to the public regarding Company's Products and/or Services including but not limited to Company's business marketing, advertising and promotional plans;

> contracts, agreements, business strategies, policies, procedures or practices; inventions, patents and patent applications, discoveries, notes, compilations, studies, ideas, concepts, software in various stages of development, designs, drawings, specifications, techniques, technical processes, models, data, documentation, diagrams, flow charts, research, development, "know-how," trade secrets, cost/price lists and pricing policies; credit card or ATM sales volumes, average credit card sales tickets, number of outlets, and terminal equipment of the Company [sic] merchant customers, financial Information, including budgets, forecasts, projections, operating results and financial statements; and/or any Confidential Information of the Company or any Confidential Information that Company has received from any other Third Parties that Company is obligated to treat as Confidential. ["]Confidential Information" shall not include information in the public domain or information which is readily available from sources other than the Company.

(Haynes Decl. Ex. A-1, DN 1-2).

In part, the Verification states:

> I . . . agree to take all reasonable precautions to assure that PAI Confidential Information and/or information that has been entrusted to PAI by third parties such as customers, will not be disclosed to unauthorized persons. At the end of my employment or contract with PAI, I agree to return to PAI all Information to which I have had access as a result of my position with the Company. I understand that I am not authorized to use this information for my own purposes, nor am I at liberty to provide this information to third parties without the express written consent of PAI.

(Haynes Decl. Ex. A-2, DN 1-2). Similarly, the Acknowledgment states:

> I understand that, as a result of my employment, I may have access to confidential information, including (but not limited to) salary information about employees, financial information about *Payment Alliance International*, and customer Information.
>
> I understand and agree that, as a condition to my continued employment, I am required to keep all of the above information confidential and not disclose any such information to any person unless authorized to do so by the head of my department. I understand that unauthorized discussion or disclosure of any confidential information may result in immediate termination of my employment.

(Haynes Decl. Ex. A-3, DN 1-2).

At the hearing, Defendant has admitted that: (i) he used a USB device to download documents containing PAI's confidential customer and financial information; (ii) he sent PAI's

confidential customer and financial information to his personal email address in the days before leaving PAI, and (iii) he sent to a competitor of PAI information regarding "cold call" targets while Defendant was still employed by PAI. (Prelim. Inj. Hr'g Tr. 28:17-29:15, 30:9-32:1, DN 43). Although Defendant has disavowed any interest in further use of PAI's information, any such use would cause irreparable harm to PAI under the express terms of the Agreement.

With respect to Plaintiff's claims regarding Defendant's violation of the non-solicitation provision of the Agreement, Plaintiff has not met its burden of showing a strong likelihood of success on the merits. The Agreement was drafted by PAI, and any ambiguity therefore must be construed against it. *See Weinberg v. Ghari*, 338 S.W.3d 307, 313 (Ky. App. 2011) ("[O]ur law is clear that the language of a contract, if susceptible to two meanings, will be construed against the drafter." (citing *Theatre Realty Co. v. P.H. Meyer Co.*, 48 S.W.2d 1, 2 (Ky. 1932))). Further, the non-solicitation obligation is in the nature of a non-compete agreement, which is to be given a narrow construction. *See Snider Bolt & Screw, Inc. v. Quality Screw & Nut*, No. 3:05-CV-738-H, 2010 WL 1032799, at *5 (W.D. Ky. Mar. 17, 2010) ("The agreement did not prohibit Scott from 'working' for a competitor; it only prohibited Scott from 'selling' to or 'soliciting' from Snider's current or former customers. That is a very narrow prohibition, and properly so. In Kentucky, a non-compete agreement must be limited in scope and duration to be enforceable." (citing *Calhoun v. Everman*, 242 S.W.2d 100, 102 (Ky. 1951))). It appears that the new business described by Defendant during the hearing does not involve the sale of goods and services which Plaintiff has offered to its customers and potential customers during the term of Defendant's employment with PAI. Instead, as described by Defendant (and reflected in the name of his new venture "National ATM **Brokerage** Company"), he intends to provide brokerage services to ATM operators wishing to sell their operations. (Prelim. Inj. Hr'g Tr. 70:15-24, 73:19-25).

Plaintiff has not demonstrated that it has provided or offered similar brokerage services to its customers. Thus, Plaintiff's request for injunctive relief to prevent Defendant from providing or offering to provide brokerage services to Plaintiff's customers is denied.

Plaintiff also seeks to preclude Defendant from using the contacts on his cellphone. Plaintiff has not demonstrated a strong likelihood of establishing that this contact information is not in the public domain or readily available from other sources to prevail on its claim for a breach of the Agreement. (Hayes Decl. Ex. A-1). Likewise, those contacts do not appear to be covered by the relevant provisions in either the Acknowledgment or the Verification, and any ambiguity must be construed against Plaintiff. (Hayes Decl. Ex. A-2; Hayes Decl. Ex. A-3). Thus, the Court concludes that Plaintiff has failed to show that it is likely to prevail on its claims relating to Defendant's cellphone contacts.

### B. Irreparable Injury

The Court must also consider whether Plaintiff will suffer irreparable injury absent the granting of a preliminary injunction. *See Tenke Corp.*, 511 F.3d at 542 (citation omitted). As the Sixth Circuit has noted, "a plaintiff's harm is not irreparable if it is fully compensable by money damages. However, an injury is not fully compensable by money damages if the nature of the plaintiff's loss would make damages difficult to calculate." *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992) (citing *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984)).

In this instance, any potential harm to Defendant by the issuance of this Preliminary Injunction as to the trade secrets and confidential information is a result of Defendant's own wrongdoing, and is outweighed by PAI's injuries and harm. Restraining Defendant from

disseminating trade secrets and breaching his restrictive covenants will merely preserve the status quo until this matter is resolved on the merits.

### C. Substantial Harm to Others

The third factor is whether others will be substantially harmed by granting injunctive relief. *See Tenke Corp.*, 511 F.3d at 542 (citation omitted). This factor does not weigh against granting Plaintiff's motion. To the contrary, the interests of Plaintiff's customers would be protected by prohibiting the disclosure of the customers' confidential information through the issuance of a preliminary injunction.

### D. Public Interest

The final factor is whether the public interest would be served by granting the preliminary injunction. *See Tenke Corp.*, 511 F.3d at 542 (citation omitted). As the Sixth Circuit has noted, "[e]nforcement of contractual duties is in the public interest" and weighs in favor of issuing a preliminary injunction. *Tenke Corp.*, 511 F.3d at 551. Thus, the issuance of injunctive relief with respect to Plaintiff's trade secrets and confidential information will not harm the public interest because the public has an interest in having contractual obligations upheld.

## V. CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** as follows:

1. Plaintiff's Motion for Preliminary Injunction (DN 5) is **GRANTED IN PART** and **DENIED IN PART**.

2. Defendant is enjoined and restrained from, directly or indirectly, whether alone or in concert with his current employer or others:

  a. using, disclosing, transferring, or transmitting (for any purpose) any confidential or trade secret information belonging to PAI;

  b. using PAI's confidential customer information to target PAI's customers;

  c. violating the terms of the Agreement dated August 22, 2016, by directly or indirectly engaging in the solicitation of products or services competitive with the products and services offered by PAI from or for any current or potential customer, independent sales organization, sponsoring agent, or correspondent financial institution with which PAI has solicited and/or is providing such products and/or services during the period of Defendant's employment with PAI (provided, however, that Defendant is not enjoined from engaging in the business of providing brokerage services to ATM operators); and

  d. destroying, deleting, erasing, modifying, or otherwise failing to preserve intact any documents, records, or files (written or electronically stored) or any other evidence regarding or related to Plaintiff's claims and allegations in this action, including, but not limited to, any evidence stored on any personal computer, cell phone, USB device, personal or other email system/network.

3. Defendant, and anyone acting in concert or participation with him, is ordered to return to PAI all confidential and trade secret information belonging to PAI, including copies and any and all electronically stored information, provided that any such information purged from an electronic source shall be printed prior to purging and all copies provided to PAI, within **twenty-four (24) hours** of entry of this Order and within **forty-eight (48) hours** of future discovery of such information being in their possession.

4. Pursuant to Fed. R. Civ. P. 65(c), PAI gave security in the amount of $10,000 to the Clerk of Court, which the Court considers proper based upon the current record, as security for the Temporary Restraining Order. That $10,000 shall serve as security for this Preliminary Injunction.

5. This Preliminary Injunction is binding upon Defendant, his agents, any employer, and any others in active concert or participation with him who receives actual notice of this Memorandum Opinion and Order.

6. This Preliminary Injunction shall remain in full force and effect until this Court rules on Plaintiff's request for a permanent injunction at the conclusion of the trial of this matter.

Greg N. Stivers, Chief Judge
United States District Court

September 8, 2021

cc: counsel of record